GARRISON FURNITURE COMPANY, ET AL v.
SOUTHERN ENTERPRISES, INC., ET AL

5-4694                                    436 S.W. 2d 278

Opinion Delivered January 13, 1969
[Rehearing denied February 17, 1969.]

*Smith, Williams, Friday & Bowen* and *Bethell, Stocks, Callaway & King* for appellants.

*Harper, Young, Durden & Smith* and *Hardin, Barton, Hardin & Jesson* for appellees.

GEORGE ROSE SMITH, Justice.   This suit was brought by the four appellants, Garrison Furniture Company, Ballman-Cummings Furniture Company, Ward Furniture Manufacturing Company, and W. H. Lillard, to quiet their title to about 91 acres constituting the southern part of a riparian tract, sometimes called Morris Island, that lies along the east bank of the Arkansas River in the city of Fort Smith.   The principal defendant, Southern Enterprises, Inc., claimed title by adverse possession and also by a chain of conveyances beginning with a 1920 deed from the State Land Commissioner and ending with a 1964 deed from five individual codefendants to Southern Enterprises.   The chancellor found that Southern Enterprises and its predecessors had acquired the entire 91 acres by adverse possession under color of title for more than seven years.   The accuracy of that finding is the issue on appeal.

The river flows north as it passes the area in dispute.   Morris Island, from its southern tip just north of the Garrison Avenue bridge, is separated from the mainland to the east by a deep narrow slough that is

ordinarily filled with water. Through the years the island, comprising wooded areas and two or three open hay meadows, has been subject to inundation from time to time and was apparently thought to be of little value until the Government decided to make the river commercially navigable. This suit to quiet title was eventually filed by the appellants on January 19, 1967.

The four tracts owned by the four appellants lie in a north-south tier along the slough, with metes-and-bounds descriptions that purport to extend to the bank of the river. On the east side of the slough the tracts are in the furniture manufacturing district and are the site of furniture factories and appurtenant buildings. Beginning at the south, the tracts are owned successively by Lillard, Garrison Furniture Company, Ward Furniture Manufacturing Company, and Ballman-Cummings Furniture Company. The appellee Southern Enterprises owns the tract lying north of Ballman-Cummings.

For many years the channel of the river has gradually shifted back and forth. It is the appellants' theory that the tract now in controversy lay on the east bank of the river when the Government originally surveyed the area. Thereafter the river gradually edged eastward, with the slough marking the line of its maximum eastward progress. Thereafter the channel slowly retreated to the west, with the southern part of Morris Island building up as an accretion to what are now the appellants' lands. Upon that theory the appellants claim record title to the property in question.

The appellee's theory is that Morris Island originated as two small islands that emerged from the river and thereby became the State's property at some time before its deed to the appellee's predecessor in title in 1920. Eventually the two small islands grew by accretion into what is now known as Morris Island. Alternatively, the appellee claims title by adverse possession under color of title. The latter theory was adopted by the chancellor.

We think it essential to first determine whether the problem area came into being as an island or as an accretion to the mainland, because in the circumstances of this case constructive possession follows the true title. Here constructive possession is important, for it is almost undisputed that for many years large parts of Morris Island have been unenclosed woods not actually occupied by anyone. In fact, aerial photographs covering a pivotal period of about thirty years leave us with no doubt whatever that much of the tract in controversy has been unoccupied and unimproved. Indeed, a sporadic cutting of timber is one of the elements of adverse possession asserted by the appellee.

It must be remembered that even if the appellee is right in arguing that it and its predecessors have been in actual possession of a field in the northern part of the 91 acres and of a hay meadow in the southern part, the appellants have also been in actual possession of their lands east of the slough. The appellants correctly assert at page 275 of their voluminous brief that in such a situation of twofold actual possession the true owner is deemed to have constructive possession of that part of the tract not occupied by either claimant.

We considered the point in *Smith* v. *Southern Kraft Corp.*, 203 Ark. 814, 159 S.W. 2d 59 (1942), where we held that constructive possession follows the true title:

> For the reversal of this decree appellant insists that, inasmuch as he had color of title to all the land in litigation, with actual possession of two small parts thereof, the court should have held that he had title to the whole thereof, and his own title should have been quieted. To sustain this contention numerous cases are cited to the effect that actual possession of any part of a tract of land under a deed describing the entire tract is possession to the limits of the calls of the deed.

We reaffirm this rule; but it must be said that it is not one which may or should be applied in all cases and under all circumstances. For instance, the owner of the record title to a tract of land might have actual possession of only a portion thereof, while another having only color of title to the land, might also have actual possession of another portion.

Under the rule above stated, each would have title to the land, provided the occupant who had only color of title had had adverse possession of the portion which he occupied for as much as seven consecutive years. In the case stated, the owner of the record title would have title to the whole of the tract except only the portion which he had lost through the adverse occupancy of the other. This for the reason stated in *Union Sawmill Co.* v. *Pagan*, 175 Ark. 559, 299 S.W. 1012, that "The general rule is that constructive possession follows the title, and can only be overcome or defeated by an actual possession adverse thereto. (Citing cases)."

If it be said that the court's statements in the *Smith* case were dictum, because there both claimants were not actually occupying part of the property, the answer is that the dictum nonetheless correctly stated the law as it has been announced in other states. In fact, we have found no case to the contrary.

The decided weight of the evidence indicates that Morris Island formed as an accretion to the mainland. Austin Smith, a civil engineer with long experience in river work, testified for the appellants. He reviewed in great detail the history of the river's channel near Fort Smith, supporting his testimony with many maps, plats, and aerial photographs. He gave convincing reasons for his conclusion that the land in dispute reemerged as an accretion after the channel reached the line of the present slough. It was his belief, based up-

on many years of study and experience, that islands very rarely form spontaneously in the Arkansas River. An avulsion is nearly always involved, which does not affect title to the land. *Goforth* v. *Wilson,* 208 Ark. 35, 184 S.W. 2d 814 (1945); see also Ark. Stat. Ann. § 10-202 (Repl. 1956).

The appellee's proof falls far short of rebutting the appellants' theory of the case. The appellee's professional engineer, James M. Rutledge, referred frequently to Morris "Island" and to the earlier "emergences" from the river, but he gave no reason whatever to lead one to believe that the lands in dispute formed as islands rather than as accretions. On the record as a whole we are firmly convinced that the appellants' contention on this point is correct.

It follows that the appellants have had constructive possession of all their land not actually occupied adversely by the appellee or its predecessors. Hence the appellee derives no benefit from its color of title. Its claim must be confined to such parts of the 91-acre tract as are shown to have been adversely occupied for seven or more years in succession.

We are not impressed by the appellee's repeated assertions in its brief that it and its grantors had actual possession of the entire tract for the required seven years. In actuality, hardly any of their activities affected the tract as a whole. Timber was cut extensively in 1953 and in 1955, but after that there were only occasional insignificant cuttings of locust posts. In the fall of 1959 J. B. Harwood built a fence across the island just south of a cultivated area near the north end of the 91 acres and allowed an undisclosed number of cattle to graze in the area south of the fence. The fence, however, was maintained for only about two years—until the Corps of Engineers began revetment work along the river in 1961—and Harwood admits that he did not keep his cattle on the property during the summer months while hay was growing.

A series of aerial photographs, taken at about two-year intervals during the critical period from 1952 to 1967, provide convincing proof that there was actually no adverse occupancy of the tract in its entirety during any seven-year period. It clearly appears from these pictures that most of the tract was woodland during the critical years.

There have, however, been patches of actual occupancy. The principal one is an area of cultivated land at the north end of the 91-acre tract, extending down from the appellee's abutting land to the north. Even the appellants' own proof, such as their exhibits 12f, 12g, and 12h, establishes this intrusion upon the Ballman-Cummings tract. The cause will be remanded for the taking of such further proof as may be necessary to a determination of the legal description of that part of the tract that has been adversely held.

The only other cleared area that appears consistently in the aerial photographs is the hay meadow at the southern end of Morris Island. It is not preponderantly proved, however, that the appellee and its grantors had exclusive, continuous, and hostile possession of that clearing for seven successive years.

The hay meadow grew up in natural grass, no one having planted it. M. A. Powers was the first one to harvest the hay with regularity, but he testified that he did not cut the hay in 1960, 1961, 1962, or 1963. J. B. Harwood said that he believed he hayed the land in 1962 and 1963. P. H. Hardin, who looked after the property for himself and the other four owners who sold it to Southern Enterprises, testified in general terms that haying was done through the years, but on cross-examination he admitted with candor that he could not say that he had actually seen either Powers or Harwood on the land in 1960, 1961, 1962, or 1963. It is not contended that anyone else cut the hay in those years.

Even if we should assume that the cutting of hay in the warmer months would alone constitute adverse possession sufficient to bring about an investiture of title, the proof fails for the years 1960 and 1961. We should add that for a part of that time the appellee relies for its claim of possession upon revetment work done by the Corps of Engineers under written permission given by the appellee's five grantors. Perhaps the possession of the Corps of Engineers would have inured to the benefit of the appellee if it had been entitled to lay claim to the entire tract under the doctrine of color of title. But when that claim fails the effect of the Corps's work was merely to establish actual possession of the reveted area along the bank. Title to that area, however, has been acquired by the United States in a condemnation proceeding in the federal court; so that possession is of no assistance to the appellee with respect to its claim of having possessed the hay meadow. This leaves the appellee with a valid claim only to the northern field that we have mentioned.

Reversed and remanded for further proceedings.

HOLT, J., not participating.

HARRIS, C.J., and BYRD, J., dissent.